IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

NEIL RUSSELL                                                      PLAINTIFF

v.                                            CAUSE NO. 3:11-CV-637-CWR-LRA

CITY OF MAGEE, MISSISSIPPI;                           DEFENDANTS
OFFICER JOE ANDREWS;
OFFICER BRAD WHITE

## ORDER

Before the Court is the defendants' motion for summary judgment. Docket No. 25. The plaintiff has responded, Docket No. 28, the defendants have replied, Docket No. 32, and the matter is ready for review. The motion will be granted in part and deferred in part.

**I.**     **Factual and Procedural History**

The facts of this case are largely undisputed. What follows is drawn from the briefs, the municipal court proceedings, and two videos recorded by the defendants' respective vehicle cameras.[1]

On August 25, 2009, plaintiff Neil Russell and a friend finished lunch at the China Buffet restaurant in Magee, Mississippi. They left the restaurant and got into Russell's vehicle; Russell began to drive away. While still in the parking lot, a City of Magee Police Department vehicle activated its blue lights and stopped them.

Officer Brad White approached the passenger side, placed Russell's friend under arrest, and moved the friend into a patrol car. Meanwhile, Officer Joe Andrews approached the driver's side and took Russell's driver's license to run a search. Officer White, returning to the passenger side of the vehicle, advised Russell that the friend had a warrant out for his arrest[2] and started to question Russell about whether he had ever been arrested. While they talked, Officer Andrews returned, again to the driver's side.

---

[1] Unfortunately, the videos contain substantial gaps in the audio, such that most of the parties' verbal exchanges cannot be heard. Officer White speculated that the error could have been caused by interference from a tractor-trailer parked next to the police vehicles, or perhaps was due to the Magee Police Department's "not the most up-to-date camera system." Docket No. 28-1, at 17, 29.

[2] The warrant was for failure to appear in court.

Officer White then asked Russell for proof of insurance. Upon learning that his first-proffered insurance card was expired, Russell reached over to open the glove compartment, arguably to search for an updated insurance card.

The glove compartment also contained a handgun. When Russell opened the glove compartment, Officer White saw the handgun and thought Russell was reaching for it. Officer White grabbed Russell's hand and shouted for assistance from Officer Andrews, who pulled Russell out from the vehicle on the driver's side, then stunned him with his taser.[3] Both officers then fired taser probes at Russell, causing him to fall to the ground.

The parties disagree about why Russell was tased. In his complaint, Russell claimed he was still "trying to ascertain what was going on" when Officer Andrews stunned him, said he turned his body in reaction to the stun, and was fired at with taser probes – needlessly, he implies. Docket No. 1, at 3-4. In contrast, the Officers have testified that Russell refused their orders to get on the ground, tried to get Officer Andrews' taser, and was tased because he was physically struggling with them. Docket No. 25-1, at 7 (trial testimony of Officer White); *id.* at 14-15 (trial testimony of Officer Andrews).

Regardless, Russell was arrested and charged with disorderly conduct and resisting arrest. On June 15, 2010, the charges were dismissed at trial in the Municipal Court of Magee.[4]

On October 13, 2011, Russell filed this suit against the City of Magee, Officer Andrews, and Officer White. *Id.* at 1. Russell alleged that the Officers lacked probable cause to detain him after arresting his friend, used excessive force against him, and were not appropriately trained and supervised by the City of Magee, among other theories of liability. *Id.* at 4. Russell's specific causes of action included 42 U.S.C. § 1983 and malicious prosecution. *Id.* at 5-8.

## II.     Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking to avoid summary judgment must identify admissible evidence in the record

---

[3] Evidence reveals a distinction between using a taser to "stun" a person – that is, to provide an "immediate shock" to the body for "compliance" – and using a taser to fire cartridges at a person. *See* Docket No. 28-1, at 13.

[4] After the prosecution rested, the court dismissed the charges because the prosecutor failed to have either of the arresting officers identify Russell in the courtroom. Docket No. 25-1, at 19-20.

showing a fact dispute. *Id.* at 56(c)(1). The Court views the evidence and draws reasonable inferences in the light most favorable to the non-movant. *Maddox v. Townsend and Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011) (citation omitted).

### III. Discussion

Omissions in Russell's briefing indicate that he has abandoned his claims against the City of Magee, his state law claims, and some of his federal theories of relief. What remains is whether Russell has sued the Officers in their individual capacities, and if so whether the Officers are entitled to qualified immunity on Russell's Fourth Amendment claims.

#### A. Official Versus Individual Capacity

"[I]f it is not clear from allegations of the complaint whether a defendant has been sued in his official or individual capacity, the court must look to the substance of the claims, the relief sought, and the course of the proceedings to determine in which capacity the defendant is sued." *Senu-Oke v. Jackson State Univ.*, 521 F. Supp. 2d 551, 556 (S.D. Miss. 2007) (citations omitted). In that case, although the complaint was "not particularly illuminating," the court determined that the plaintiff intended to sue the defendants in their individual capacities because the complaint sought monetary relief, which was not available against the defendants in their official capacities since Jackson State University is an arm of the State of Mississippi. *Id.* at 557.

Here, the substance of Russell's complaint did not conclusively show that he brought individual capacity claims. While Russell articulated a classic Fourth Amendment violation fact pattern, he did not explicitly say that the Officers were sued in their individual capacities. Docket No. 1.

The relief sought also did not clearly indicate an individual capacity claim. Unlike in *Senu-Oke*, where money damages could be sought only against individual-capacity defendants, Russell's request for monetary damages does not resolve the issue here because monetary damages were available against the City of Magee. Of potential interest, however, is Russell's prayer for damages against the defendants "jointly and severally." Docket No. 1, at 9. That is suggestive of individual capacity liability because a judgment against the Officers in their official capacities would have merged with the City's own liability, making joint and several liability unnecessary.

As for the course of the proceedings, the defendants certainly anticipated that Russell's claims *could* have been brought against the Officers in their individual capacities, since their

3

artfully-worded answer included the following affirmative defense: "To the extent Plaintiff alleges any claim against Joe Andrews and Brad White in their individual capacities, each is entitled to qualified immunity." Docket No. 3, at 1. The defendants obviously have not been prejudiced by Russell's ambiguous complaint. But the defendants should not be punished for preserving all possible defenses at the earliest stage possible.

The Court will hear argument on this issue, requesting that the parties focus on whether the rest of the proceedings adequately supported that Russell's claims were brought against the Officers in their individual capacities.

### B. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted). "This immunity protects all but the plainly incompetent or those who knowingly violate the law, so we do not deny immunity unless existing precedent must have placed the statutory or constitutional question *beyond debate*." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (quotation marks and citations omitted).

At the summary judgment stage, the Court must determine (1) "whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights," and (2) "whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007) (citations omitted). In determining whether a defendant's actions were objectively unreasonable, the Court considers "the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Id.* at 411.

Russell's Fourth Amendment theories of liability are (1) whether he was unlawfully detained, (2) whether he was subjected to excessive force, and (3) whether he was falsely arrested. There is no doubt that in August 2009, the relevant law in each of these three areas was clearly established. *See, e.g.*, *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009). As a result, the below discussion focuses on whether the Officers' conduct was objectively unreasonable.

### 1. Unlawful Detention

Russell claims he was unlawfully seized by the Officers in violation of the Fourth Amendment when they refused to let him leave the parking lot after arresting his passenger. Docket No. 29, at 7-11. The Officers had accomplished their goal, he says, by apprehending his friend and placing the friend in a police vehicle. Russell further contends that the Officers lacked reasonable suspicion or probable cause to detain him, and could not request his insurance card, because he had committed no traffic violation and because the stop was not a "roadblock." *Id.* at 9 (citing Miss. Code § 63-15-4). He adds that his handgun was lawfully present in his vehicle. *Id.* at 10 (citing Miss. Code § 97-37-1).

The Officers argue that they had a right to question Russell after arresting his friend. Docket No. 26, at 13-14. The cases they cite for that proposition, though, hold that law enforcement officers may lawfully question a driver when the driver is pulled over for a traffic violation. *E.g.*, *United States v. Brigham*, 382 F.3d 500, 504 (5th Cir. 2004) (en banc) (driver pulled over for following too closely); *United States v. Grant*, No. V-05-151, 2007 WL 677636, *4 (S.D. Tex. Feb. 28, 2007) (driver pulled over for failure to maintain lane).

In this case, it is undisputed that Russell did not commit a traffic violation. Docket No. 28-1, at 7 (testimony of Officer White). At Russell's municipal court trial, for example, Officer White testified that the only reason for the stop was to arrest Russell's passenger. *Id.* Officer White explained that he had questioned Russell "to make sure his insurance was valid and make sure he wasn't wanted." *Id.* at 18. The Officer maintained that he had the authority to ask for the insurance information because Russell "had been detained for the reason of arresting [the passenger]." *Id.* at 19-20. When pressed, Officer White then said Russell was pulled over for "reasonable suspicion," but could not articulate what Russell was suspected of doing. *Id.* at 20.

"Pursuant to *Terry*, the legality of police investigatory stops is tested in two parts. Courts first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506 (citation omitted). "This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id.* at 507 (citations omitted). Restated, "a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including

the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop." *Id.* at 512. "In a garden variety *Terry* stop, the nature of the questioning during a later portion of the detention may indicate that the justification for the original detention no longer supports its continuation." *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993).

During this inquiry the Court is to focus on "reasonableness" under all the circumstances, "giving due regard to the experience and training of the law enforcement officers." *Brigham*, 382 F.3d at 507. "Reasonableness requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement." *Id.* (citation omitted).

There is no dispute that the Officers were entitled to stop Russell's vehicle to arrest his passenger. There is a dispute, however, as to whether the Officers' subsequent actions went beyond those reasonably necessary to effectuate the purpose of the stop. The Officers had successfully and safely made their arrest without incident. Having accomplished their mission, it is not clear why they needed to reapproach Russell. The Officers admitted that Russell had broken no laws and committed no traffic violations. Nor was it appropriate to request proof of insurance, since Mississippi law provides that "no driver shall be stopped or detained solely for the purpose of verifying that an insurance card is in the motor vehicle unless the stop is part of such roadblock." Miss. Code § 63-15-4(3). This was not a roadblock.

The videos show that Officer White was unsatisfied with Russell's answers regarding his arrest history, even though Russell admitted he had been arrested for DUI years ago. Notwithstanding that response, Officer White then directed Officer Andrews to "run a 31," saying, "apparently he [Russell] can't understand what I'm talking about here." Officer Andrews then relayed a radio message to "run a 31 on that."[5]

It is not entirely clear on this record what "run a 31" means,[6] but it is evident that the detention was prolonged because of Officer White's dissatisfaction with Russell's answer. And yet at the underlying criminal trial, Officer White could not articulate any reasonable suspicion justifying prolonging Russell's detention. *See United States v. Ibarra-Sanchez*, 199 F.3d 753, 758

---

[5] This is shown on the second video, which may have been taken from Officer Andrews' vehicle.

[6] Officer Andrews' testimony suggests that it was a criminal history search. Docket No. 25-1, at 14.

6

(5th Cir. 1999) ("Officers must base their reasonable suspicion on specific and articulable facts, not merely inarticulate hunches of wrongdoing. Moreover, the facts giving rise to reasonable suspicion must be judged against an objective standard."). Officer White's questions to Russell reinforce that there was no articulable reason to detain Russell after his passenger had been arrested, and may instead suggest that the Officers were looking for a reason to arrest Russell. *E.g.*, *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001) ("there is simply no evidence to support a claim of reasonable suspicion beyond that which led to the initial stop. Further detention was not lawful after the point at which the purposes of the stop was resolved"). That will depend on how the evidence at trial falls out.

Under all these circumstances, the Court cannot conclude that the detention of Russell was objectively reasonable or unreasonable. Summary judgment will therefore be denied on this claim, if and only if Russell is determined to have brought individual capacity claims against the Officers.

### 2. Excessive Force

It is "well settled that if a law enforcement officer uses excessive force in the course of making an arrest, the Fourth Amendment guarantee against unreasonable seizure is implicated." *Hunter v. Town of Edwards*, 871 F. Supp. 2d 558, 564 (S.D. Miss. 2012) (quotation marks and citation omitted). "In order to succeed on a § 1983 claim that the defendants violated his Fourth Amendment right against excessive force, a plaintiff must show that he was seized and that he suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006) (quotation marks and citations omitted). Here, because the parties' briefing suggests no dispute as to element one, the Court focuses on the second and third elements of the excessive force standard.

"To gauge the objective reasonableness of the force, we must balance the amount of force used against the need for force." *Carnaby v. City of Houston*, 636 F.3d 183, 187-88 (5th Cir. 2011) (quotation marks and citation omitted). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ballard*, 444 F.3d at 402 (quotation marks and citation omitted). "The test for 'reasonableness' on a Fourth Amendment excessive force claim requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the

subject poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Hunter*, 871 F. Supp. 2d at 564 (quotation marks and citation omitted). Whether the force used was objectively reasonable is a question of law for the Court to resolve. *Carnaby*, 636 F.3d at 188; *see Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc).

The Court has reviewed the videotapes of the stop in accordance with the Supreme Court's admonition to "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see Carnaby*, 636 F.3d at 187 ("we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene").

The videos show that the Officers used force in approximately three stages. The first was when Officer White pushed and Officer Andrews pulled Russell out of his vehicle, in response to his perceived attempt to reach for a handgun in the glove compartment. The second stage was when Officer Andrews used his taser to stun Russell in the small of Russell's back. The third and final stage was when the Officers each fired taser cartridges, or probes, at Russell, causing him to fall to the ground.

Considering the first stage, the Officers' use of force to distance Russell from his handgun is entitled to qualified immunity. We will never know whether Russell intentionally reached for his firearm or instead merely failed to disclose that a firearm was in a compartment he was about to open, which may have prevented this situation from developing at all.[7] It does not matter. The Officers' pushing and pulling of Russell to get him out of his vehicle was neither excessive nor objectively unreasonable.

Regarding the second stage, the videos cast doubt on the propriety of Officer Andrews' use of a taser to stun Russell upon his removal from the vehicle. The videos show Russell standing next to his truck bed, so it is true that Russell was not on the ground, contrary to the Officers'[8] commands

---

[7] According to one of the videos, when Russell is being pushed/pulled out of his vehicle, he says, "hell, I didn't even know . . . ." The excited utterance may suggest that he did not knowingly reach for his firearm. But whether Russell knew there was a gun in his glove compartment is not material to whether the Officers' were entitled to use reasonable force to separate him from that weapon, for their own safety. They were.

[8] There is a dispute in the papers about whether one or both Officers made the specific command. Although the videos are not conclusive, it appears that only Officer White, who was farthest away from Russell, shouts to Russell to get on the ground. Officer Andrews, who was standing immediately next to Russell, does not appear to

8

to "get on the ground." And it is well-established that "Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance." *Deville*, 567 F.3d at 167 (citations omitted).

On the other hand, it also is relevant that when Russell was tased, the videotape shows he was standing still, with his back toward Officer Andrews in a non-aggressive posture, and *with his arms behind his back in anticipation of handcuffs being placed on his wrists*. That pose suggests compliance, not ongoing danger or willful disobeyance of an Officer's command. But he was tased in the small of his back while in that pose. As a result, there may be a fact dispute about whether, given the nature of Russell's resistance, and viewing "the facts in the light most favorable to plaintiffs, a jury could reasonably find that the degree of force the officers used in this case was not justifiable under the circumstances," specifically because the Officer failed to "assess not only the need for force, but also the relationship between the need and the amount of force used," as required by the Fourth Amendment. *Id.* at 167-68 (quotation marks and citations omitted). It is appropriate to take oral argument on whether this incident is sufficient to overcome qualified immunity.

To round out the record, however, the Court will press on and summarize "stage three" of the Officers' use of force. It continues from the point where Russell is standing in a "cuff me" position.

It is evident that Russell was not looking at the taser and may not have been aware that an electric shock was coming. Upon being stunned he reacted instinctively, turned his body, and moved his arms out from behind his back.

The Officers quickly moved to either side of Russell. Officer Andrews pulled Russell's left arm while Officer White grabbed Russell's neck in an attempt to bring him to the ground. The problem is that the Officers pulled Russell in opposite directions and canceled out each other's efforts; Russell remained standing. Then, after a momentary entanglement of limbs, all three separated. In a moment of audio, someone is heard asking "why are you . . . ." The Officers drew their tasers against Russell, who backed up several steps and leaned backward toward his truck bed. The Officers then fired taser cartridges at Russell, who fell to the ground.

The Court will also hear argument on how this use of force influences the qualified immunity

---

have made a similar command.

9

analysis.

### 3. False Arrest

Finally, Russell argues, albeit in a rather summary fashion, that his arrest for disturbing the peace and resisting arrest violated the Fourth Amendment because the Officers lacked probable cause. Docket No. 29, at 12.

"In order to prevail in a § 1983 claim for false arrest, a plaintiff must show that he was arrested without probable cause in violation of the Fourth Amendment." *Parm v. Shumate*, 513 F.3d 135, 142 (5th Cir. 2007) (citation omitted). "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655-56 (5th Cir. 2004) (quotation marks and citation omitted). "If there was probable cause for any of the charges made . . . then the arrest was supported by probable cause, and the claim for false arrest fails." *Deville*, 567 F.3d at 164 (quotation marks, citation, and emphasis omitted).

When the defense of qualified immunity is asserted in a false arrest case, "the plaintiff must show that the officers could not have reasonably believed that they had probable cause to arrest the plaintiff for any crime." *Good v. Curtis*, 601 F.3d 393, 401 (5th Cir. 2010) (citations omitted). "[L]aw enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to [qualified] immunity." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009) (quotation marks and citation omitted).

Mississippi law provides that a person has committed a misdemeanor when he, "under such circumstances as may lead to a breach of the peace, or which may cause or occasion a breach of the peace, fails or refuses to promptly comply with or obey a request, command, or order of a law enforcement officer." Miss. Code § 97-35-7(1).

Given this definition, and considering the videos, the Officers likely reasonably believed they had probable cause to arrest Russell for breaching the peace by disobeying their commands. Although the Court is inclined to grant the Officers qualified immunity on this claim, it is prudent to wait for the hearing, in the event that part of the video or additional argument persuasively shows facts sufficient to overcome qualified immunity on this theory of recovery.

## IV.     Conclusion

The motion for summary judgment is granted as to the City of Magee and many of Russell's theories. The remainder of the motion is deferred for resolution at a hearing.

**SO ORDERED**, this the 26th day of March, 2013.

s/ Carlton W. Reeves<br>
UNITED STATES DISTRICT JUDGE